

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DGR/NJM/LRO/JML                    *271 Cadman Plaza East*
F. #2018R00788                      *Brooklyn, New York 11201*

November 23, 2022

By ECF

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Kassin Appling
               Criminal Docket No. 20-239 (S-3) (BMC)

Dear Judge Cogan:

        The government writes in advance of the defendant Kassin Appling's sentencing, which is scheduled for November 30, 2022, at 4:00 p.m.  The defendant, while detained pending trial at Rikers Island, conspired with other members of his gang—known as the "Bully Gang"—to smuggle papers soaked in a synthetic cannabinoid into the facility.  For the reasons set forth below, the government respectfully submits that a sentence within the applicable range under the U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines") of 24 to 30 months, to run consecutive to any term of incarceration imposed in the defendant's pending state case, is appropriate.

      I.      <u>Background</u>

        As set forth in the Presentence Investigation Report (the "PSR"), between June 17, 2019, and March 9, 2021, the defendant was an inmate at Rikers Island, a complex of correctional facilities operated by the New York City Department of Correction ("DOC").  (PSR ¶¶ 19, 46).  During that time, the defendant and others—including co-defendants Moeleek Harrell, Laron Estrada, Terrell Ratliff, Paul Harris, Nehemie Eril, Brittany Duncan and Jamel Smith—conspired to smuggle papers soaked in synthetic cannabinoids, including 4F-MDMB-BUTINACA, into Rikers Island by mail and in-person, including by providing cash bribes to DOC officers.  Once the inmate-defendants received the narcotics-soaked papers, they sold them in smaller quantities to fellow inmates at a substantial profit.  Notably, several of the inmates involved—including the defendant—were members of the violent "Bully Gang."

        Appling was at Rikers in connection with a June 17, 2019 incident in which he "was observed firing multiple [gun]shots into a crowd" before fleeing in a car at speeds "in

excess of 70 miles per hour" and crashing into a parked car. (PSR ¶ 46). At the time of his arrest, the defendant was in possession of a loaded Glock 9-millimeter pistol and an extended magazine capable of holding 30 bullets. (Id.).

Recorded jail calls from Rikers confirm that the defendants' co-conspirators, including Harrell, the leader of the gang, viewed the defendant, to whom they referred as "Killa," as a member of the Bully Gang.

The defendant also helped Harrell in the lucrative racket of selling drugs at Rikers. The defendant and his girlfriend, an unindicted co-conspirator ("UCC-1"), spoke to co-defendants Harrell (who was also incarcerated at Rikers but who participated in recorded three-way calls), Paul Harris and Nehemie Eril (Harrell's girlfriend), about Harrell and Appling's schemes. On one date in March 2020, UCC-1 told the defendant she was sending money to Eril, and then attempted to send $3,500 to Eril, $2,000 of which was flagged and not transferred. UCC-1 confirmed to the defendant that she paid Eril the rest the next day. UCC-1 provided the defendant drugs shortly thereafter.

Also in March 2020, Harrell and the defendant spoke (over a three-way call connected by Eril) and discussed additional transactions involving Harris (with whom the defendant put his girlfriend UCC-1 in touch). Ultimately, UCC-1 informed the defendant, in some and substance, that the drugs would be sent in through legal mail. In April 2020, Rikers officials seized five apparently drug-soaked sheets from the defendant's legal mail.

In total, the defendants and their associates collected thousands of dollars from their drug trafficking activity, using those proceeds to purchase more narcotics and to continue smuggling contraband into Rikers Island. They also bribed at least two corrections officers as part of the scheme.

In February 2021, the defendant was charged in Counts Eight and Nine of a third superseding indictment (the "S-3 Indictment") with narcotics trafficking conspiracy, in violation of Title 21, United States Code, Sections 841(b)(1)(C) and 846, and money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h). On March 11, 2022, the defendant pled guilty to Count Eight, the narcotics trafficking conspiracy.

II.    Applicable Guidelines Range

The defendant pled guilty to violating 21 U.S.C. §§ 846 and 841(b)(1)(C). The applicable Guidelines range, as set forth in the PSR, is not in dispute:

| | | |
|---|---|---:|
| Base Offense Level (§§ 2D1.1(a)(5) and 2D1.1(c)(14)) | | 12 |
| Plus: | Distribution in a detention facility (§ 2D1.1(b)(4)) | +2 |
| Plus: | Offense involved bribery of DOC officers (§ 2D1.1(b)(11)) | +2 |
| Total: | | 16 |

2

Less: Acceptance of Responsibility (§ 3E1.1(a))                    <u>-3</u>

Adjusted Offense Level:                                            <u>13</u>

With a Criminal History Category of IV and an adjusted Offense Level of 13, this produces a Guidelines range of 24 to 30 months.

  III.  <u>The Appropriate Sentence</u>

   A.  <u>Applicable Law</u>

   In <u>United States v. Booker</u>, 543 U.S. 220, 245 (2005), the Supreme Court held that the Guidelines are advisory and not mandatory.  The Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but they may also tailor the sentence to account for other statutory concerns.  <u>Booker</u>, 543 U.S. at 220; <u>see</u> 18 U.S.C. § 3553(a).  After <u>Booker</u>, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to consider them, along with the other factors listed in section 3553(a)."  <u>United States v. Crosby</u>, 397 F.3d 103, 111 (2d Cir. 2005).  Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum."  <u>Id.</u> at 113.

   The Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the sentencing court] may not presume that the Guidelines range is reasonable.  [The sentencing court] must make an individualized assessment based on the facts presented."  <u>Id.</u> at 49-50 (citation and footnote omitted).

   Section 3553(a) requires a court to consider a number of factors in imposing sentence, including the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation; and the need for the sentence to afford adequate deterrence to criminal conduct; to protect the public from further crimes or violation of the defendant; and to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner.  The court must also consider the kinds of sentences available, the applicable sentencing guideline and pertinent policy statements, and the need to avoid unwarranted sentencing disparities.  <u>See</u> 18 U.S.C. § 3553(a)(1)-(6).  District courts "have discretion to select whether the sentences they impose will run concurrently or consecutively with respect to other sentences . . . that have been imposed in other proceedings, including state proceedings."  <u>Setser v. United States</u>, 566 U.S. 231, 236 (2012); U.S.S.G. § 5G1.3 Commentary.

B.    Discussion

Given the serious and brazen nature of the instant offense, coupled with the defendant's prolonged and troubling criminal history, the Court should sentence the defendant to a term of imprisonment within the applicable Guidelines range of 24 to 30 months, to run consecutive to any sentence imposed on his pending state charges relating to his shootings.

As detailed above and in the PSR, the Rikers Island drug trafficking scheme was a long-term and sophisticated operation. The defendant and his co-conspirators were responsible for trafficking significant quantities of narcotics-soaked papers into Rikers Island, where they dispersed narcotics in smaller quantities to fellow inmates at a substantial profit. The conspiracy extended well beyond the walls of Rikers Island, employing co-conspirators outside the facility to obtain narcotics, coordinate with inmate-defendants to smuggle drugs into the facility, and collect payment. All told, the operation generated thousands of dollars in proceeds.

The defendant's conduct in this case was not only serious, but brazen. Among other things, the co-conspirators used cash bribes and the DOC legal mail system to smuggle narcotics into a detention facility—this undermines procedures set in place to ensure the detainees' access to communications from counsel and makes that practice more onerous. The defendant and others can also be heard at length discussing the narcotics trafficking conspiracy, including drug pricing and CashApp transactions, on recorded jail calls. The need to "promote respect for the law" is therefore particularly salient in this case and favors a meaningful sentence. 18 U.S.C. § 3553(a)(2)(A).

In his sentencing submission, the defendant asks the Court to impose a sentence of time served, arguing that he is a victim of "a failing educational infrastructure,"[1] Def. Ltr. at 3 and a deliberate similarity between schools and jails, id. at 4, from a community ravaged by "the war on drugs," id., and that his trip through "the school to prison pipeline," id. at 8, was pre-ordained. The defendant claims that he "had very little chance to escape the path that was set before him." Id. at 4. The defendant, however, enthusiastically embraced a life of crime in a way that most people in his neighborhood did not; his circumstances, while bad, did not pre-ordain his violent and persistent criminality. He now has the gall both to blame society for his poor decisions, and to describe this position as "tak[ing] full accountability for his actions." Id.

The defendant is a violent member of a violent gang who, while incarcerated and while in society at large, disobeyed the rules and has been repeatedly caught committing serious infractions. Outside of prison, he committed his first crime of violence in 2003 and never looked back. (PSR ¶ 36). After that second-degree robbery, he conducted two shootings from a vehicle (id. ¶¶ 38, 46); he stole a car (id. ¶ 37); and he violently robbed multiple victims at gunpoint, causing physical injury (id. ¶ 39); among other serious crimes.

---

[1]    The defendant's submission also repeatedly argues that he had undiagnosed learning disabilities that led to social promotions and "academic failure," Def. Ltr. at 3, although the defendant "recalled earning good grades" in school, PSR ¶ 63.

4

Perhaps more telling, even while incarcerated, the defendant has consistently incurred serious disciplinary infractions, including for "violent conduct" and fighting (PSR ¶ 38) and for gang activity, drug possession, and smuggling (id. ¶ 39), even before the instant case. In the instant case, the defendant corrupted the legal mail system at the jail and his co-conspirators bribed multiple corrections officers. This defendant has decided that the rules do not apply to him, and his prior sentences—including a three-year sentence for his more recent robbery conviction—have not disabused him of that belief. He will continue to commit crimes, and to blame the society his crimes weaken, until he is unable to do so.

Punishing this defendant for his conduct in this case—his participation, with fellow gang members, in a broad conspiracy to corrupt prison officials and to inject poison into a vulnerable population of inmates, in light of a decades-long, violent criminal history—is not likely to "continue the phenomenon of mass incarceration." Def. Ltr. at 12. There is no mass of people similar to this defendant. When evaluated fairly and in light of the context of his crimes, a Guidelines sentence is, if anything, generous for the defendant.

Finally, while the Court has the discretion to make all or some of the defendant's sentence concurrent to any term imposed in his state case, see U.S.S.G. § 5G1.3 Commentary App. Note 4(A) ("[T]he court may impose a sentence concurrently, partially concurrently, or consecutively to the undischarged term of imprisonment."), a concurrent sentence is not warranted where, as here, the relevant cases involve entirely separate offenses that warrant distinct punishment. As the Second Circuit has noted, in such cases, "a consecutive sentence serves as a separate punishment to deter" the second layer of conduct. United States v. Vega, 712 F. App'x 95, 96 (2d Cir. 2018) (supervised release violation sentenced consecutively to underlying state criminal charge). Here, the defendant was arrested in June 2019 on reckless endangerment and other charges in connection with shooting multiple bullets at a crowd of people (PSR ¶ 46). That conduct is a separate, and very serious, crime; the defendant's punishment for that crime will stand alone as a just punishment for that offense alone.

Any sentence imposed for the shooting is distinct from the defendant's subsequent criminal conduct: trafficking narcotics in a jail facility for profit while detained pending trial. Additional punishment is necessary to deter additional criminal conduct, or defendants charged with serious crimes can misbehave in jail pending trial with impunity. Cf. United States v. Baez, No. 09-CR-74 (BMC), 2020 WL 2615928, at *3 (E.D.N.Y. May 22, 2020) ("Still unrepentant for his crimes, [the defendant] became enraged and tried to assault an officer of the court during his sentencing . . . Defendant's repeated criminal behavior demonstrated his complete disregard for the law and compelled me to impose the . . . consecutive sentence to serve as some level of specific deterrence.").

The gravity of the defendant's conduct, the need to protect the public from this specific person, and the clear need for specific deterrence, warrant a serious response. For the foregoing reasons, the Court should impose a sentence within the applicable Guidelines range of 24 to 30 months and exercise its discretion to run the defendant's sentence consecutive to any state sentence.

IV.    Conclusion

        For the reasons set forth above, the government submits that a consecutive sentence within the applicable Guidelines range of 24 to 30 months is appropriate.


        Respectfully submitted,

        BREON PEACE
        United States Attorney

By:       /s/
        Drew G. Rolle
        Nicholas J. Moscow
        Lindsey R. Oken
        Joy Lurinsky
        Assistant U.S. Attorneys
        (718) 254-7000

cc:    Keith White, Esq. (Counsel to the defendant) (by ECF)
       U.S. Probation Department (by E-Mail)

6